U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 25, 2007**

**United States Bankruptcy Judge**

---

THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| LEWIS EUGENE WOOD, | § | CASE NO. 03-81965-SGJ-7 |
|     DEBTOR. | § | |
| ————————————————— | § | |
| | § | |
| JAMES P. GRAHAM and | § | |
| RAY S. TOLSON, III, | § | |
|     PLAINTIFFS, | § | |
| | § | |
| V. | § | ADVERSARY NO. 04-3191 |
| | § | |
| LEWIS EUGENE WOOD, | § | |
|     DEFENDANT. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF
JUDGMENT OF NONDISCHARGEABILITY**

The following constitutes the court's findings of fact

and conclusions of law in connection with the trial on the

Objection to Dischargeability Under 11 U.S.C. § 523(a)(2)

and 11 U.S.C. § 523(a)(4), the First Amended Adversary

Petition (the "Amended Complaint") of James P. Graham ("Mr.

Graham") and Ray S. Tolson, III ("Mr. Tolson") (collectively, the "Plaintiffs" or "Messrs. Graham and Tolson"), and the Defendant's Answer to Plaintiffs' Amended Objection to Dischargeability Under 11 U.S.C. § 523(a)(2) and 523(a)(4) (the "Answer") filed by Lewis Eugene Wood (the "Defendant," the "Debtor," or "Mr. Wood"). Where appropriate, any finding that should more appropriately be regarded as a conclusion shall be regarded as such, and vice versa.

### **FINDINGS OF FACT**

### **Introduction**

1.   This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

2.   This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

3.   A trial of this matter occurred on March 20, 2007, after approximately two years of appeals stemming from the dismissal of this adversary proceeding by the judge previously presiding over this matter,[1] as a sanction for Plaintiffs' failure to adhere to certain discovery and pretrial procedures. Such dismissal was reversed and the matter was remanded for a trial on the merits.

---

[1] Former Chief Judge Steven A. Felsenthal.

**The Key Players in this Litigation**

4.    Mr. Wood is the Debtor in the above-referenced bankruptcy case and, during the time period relevant to this adversary proceeding, was heavily engaged in the real estate development business.

5.    On August 31, 1999, an entity named Urban Woods on Commerce, Ltd. ("Urban Woods") was formed by the Debtor to develop sixteen luxury town homes on Commerce Street, in an up-and-coming, fashionable, youth-oriented area of Dallas known as Deep Ellum.  The Urban Woods project is at the center of this litigation.

6.    The equity owners of Urban Woods were as follows: Pan American Capital Corporation 1996 ("PACC 1996") was the general partner and four persons were limited partners—HP Commerce Partners, Ltd.; Mary Spencer, individually; 2M Real Estate Partners, Ltd.; and Dale Henry, Jr., individually. *See* Pls. Exh. 7, exhibit B thereto.

7.    The Debtor was initially the 75% shareholder of the general partner of Urban Woods, PACC 1996.  The 25% shareholder of the general partner was an individual named Charles Ragan.  Mr. Wood acquired Mr. Ragan's 25% interest in PACC 1996 in November of 2001.

-3-

8. Mr. Wood was also the 100% shareholder of a company called Pan American Capital Corporation ("PACC"), which was formed in 1993, and he was the 51% majority shareholder of a company called Pan American Group, LLC ("PA Group"), which was formed in 1997.

9. PA Group was the general contractor for the Urban Woods project. PACC (not to be confused with *PACC 1996*) had no ownership interest in, no contractual relationship with, nor any other connection with Urban Woods—except for its ultimate role as a co-borrower on the Loan (hereinafter defined) that is at the center of this adversary proceeding.

**Commencement in Spring 2000 of the Urban Woods Project**

10. On May 12, 2000, Urban Woods obtained a construction loan from Texas Savings Bank in the amount of $2.3 million. Construction was scheduled to soon commence on the Urban Woods project.

11. Construction was expected to take 160 working days, but heavy rain during the late spring and early summer of 2000 delayed the start of the project for approximately two months, until July of 2000.

12. In addition to rain delays, Mr. Wood testified that there were also soil problems at the project. Specifically, they could not find bedrock onto which to rest

-4-

the piers to support the buildings. Mr. Wood testified that the engineers went down forty-five feet and could not find bedrock. The Plaintiffs in this action, Messrs. Graham and Tolson, assert that they were initially unaware of the soil problems at Urban Woods.

**Introduction in Fall 2000 of Messrs. Graham and Tolson to the Urban Woods Project**

13.  In September of 2000 (two months after the commencement of the project and four months after Urban Woods obtained the original construction loan), Mr. Wood approached Mr. Graham in need of a loan. Initially, Mr. Wood was seeking to reorganize all of his several real estate development companies. Mr. Wood and Mr. Graham both testified that, although Mr. Wood approached Mr. Graham about investing generally in Mr. Wood's various real estate projects, Mr. Graham reacted only with an interest in funding a specific project.

14.  Accordingly, Mr. Wood presented the following projects to Mr. Graham: Pan American Motor, LLC (a development on Motor Street in Dallas); Urban Woods; and Deep Ellum Development, Ltd. (an initially three-property loft development).

15. Mr. Wood testified that Mr. Graham expressed interest in Urban Woods and was not interested in the other two projects.

16. On September 29, 2000, a change order (Pls. Exh. 29) was given to PA Group, extending the time for completion of Urban Woods for seventy-two working days. Messrs. Graham and Tolson assert that they were unaware of this extension of time. Mr. Wood cannot remember whether or not he told Mr. Graham of this time extension.

17. In any event, Messrs. Graham and Tolson testified that Mr. Wood represented to them that the Urban Woods project would be ready to show to potential occupants in January of 2001. Mr. Wood disputes having made such a representation because it would have been impossible for Urban Woods to be ready by January of 2001.

18. On October 4, 2000, Mr. Wood sent a facsimile to Mr. Graham regarding the Urban Woods project (Pls. Exh. 1), showing that the initial projected cost of Phase I of the development would be $2,960,000. Mr. Wood maintained that $2,960,000 was still a valid estimate of cost for Phase I notwithstanding two months of delay. When asked why he thought, in October of 2000, that the actual cost of Urban Woods Phase I would be the same as the initial projected

-6-

cost, despite the two-month delay in the start date, Mr. Wood testified that he believed they could catch up the time or increase the ultimate sales price of the units. Mr. Wood admitted that this would not, however, reduce or limit the development costs.

19. Meanwhile, Mr. Graham assessed that he could not personally finance a loan to Urban Woods, so he suggested that Mr. Wood attempt to obtain a loan from Dallas National Bank, where Mr. Graham had a prior relationship as both customer and stockholder, and Messrs. Graham and Tolson would pledge a piece of real property they owned as collateral for the loan.

20. Specifically, Messrs. Graham and Tolson agreed to pledge a 4.7 acre industrial lot in the Lone Star Industrial Park located at Commerce Street and Postal Way in Dallas, Texas (the "Property") on a $250,000 loan that *Mr. Wood and his 100%-owned company PACC* ultimately obtained from Dallas National Bank, which loan was dated November 3, 2000 (the "Dallas National Bank Loan" or "Loan").[2] Pls. Exhs. 10 & 12.

---

[2] The loan agreement shows, and promissory note reflects, a loan to Mr. Wood and PACC of $250,000 for a term of one year with quarterly interest payments. Pls. Exhs. 10 & 12. Pursuant to a deed of trust, Messrs. Graham and Tolson pledged the Property as collateral for the Loan. Pls. Exh. 11.

21. In consideration for the pledge of the Property, it was agreed that Messrs. Graham and Tolson would receive the net profits of Urban Woods. Pls. Exh. 14.

22. The Plaintiffs presented two appraisals of the Property to establish value. One appraisal by Butler Burgher, Inc. indicates the Property was worth $300,000 as of April 28, 2003. Pls. Exh. 22A.

23. A second appraisal, also by Butler Burgher, Inc., which occurred shortly in advance of the Loan, indicates the Property was worth $370,000 as of October 18, 2000. Pls. Exh. 22B.

24. A further indication of the Property's possible value is Pls. Exh. 19, which is the Trustee's Deed from Dallas National Bank's ultimate foreclosure on the Property, on November 4, 2003, after Mr. Wood and PACC defaulted on the Loan. It indicates that the Property was sold at foreclosure for $249,017.61, leaving a deficiency claim of $51,123.55.[3]

---

[3] The court takes judicial notice of proof of claim number 3 filed in this case by Dallas National Bank in the unsecured amount of $51,123.55, representing its post-foreclosure deficiency claim. It appears from Pls. Exh. 19 that Dallas National Bank actually credit bid its debt in purchase of the Property at foreclosure. There is no indication in the record regarding for how much Dallas National Bank eventually sold the Property.

25.  Additionally, Mr. Graham opined that he and Mr. Tolson believed the Property to be worth between $450,000 and $500,000 at the time of foreclosure.

26.  The court finds the value of the Property at the time it was pledged is the relevant value to use in this litigation.  Based upon the evidence presented, the court finds the value of the Property was $370,000 at the time it was pledged.  This is consistent with the October 18, 2000 appraisal, which is the only evidence of value of the Property at or around the time it was pledged in connection with the Dallas National Bank Loan.  Pls. Exh. 22B.

**The Structure of the Dallas National Bank Loan:  Mr. Wood and PACC as Borrowers—not Urban Woods and not PACC 1996**

27.  As previously indicated, Mr. Wood and PACC, not Urban Woods (and not PACC 1996—the general partner of Urban Woods), were the named borrowers on the Dallas National Bank Loan.  As previously mentioned, PACC had no legal interest in Urban Woods, nor any legal interest in PACC 1996 for that matter.  The link among the three business entities was simply Mr. Wood.  Mr. Wood was the 100% owner of PACC and the 75% owner (later increased to 100%) of PACC 1996.

28.  Messrs. Graham and Tolson assert that they were unaware that PACC had no legal interest in Urban Woods and

-9-

that Mr. Wood never made them aware that PACC had no such interest.

29.   Apparently, there was a tendency of all concerned to confuse PACC 1996 (the general partner of Urban Woods) with PACC.  For example, Pls. Exh. 5 is a copy of a memorandum from Mr. Graham to counsel for Messrs. Graham and Tolson, Dennis Grindinger, which asserts that PACC was the general partner of Urban Woods.

30.   Pls. Exh. 6 is the same memorandum as Pls. Exh. 5, with handwritten corrections by Mr. Wood's counsel at Henry & Jones, L.L.P. to reflect that it was PACC 1996 that was the general partner of Urban Woods and also to make clear that Mr. Wood himself did not own the general partner distributions of Urban Woods, but, rather, PACC 1996 owned those distributions.  Mr. Graham testified that Pls. Exh. 6 was probably a communication between attorneys (that is, between his counsel, Mr. Grindinger, and Mr. Wood's counsel), and that he probably received a copy of it before the Dallas National Bank Loan transaction closed.

31.   Mr. Graham testified that Pls. Exh. 5 was merely a general memorandum to start discussions with his attorney and set forth some general points of the anticipated deal but was not intended to document the whole deal.  Mr. Graham

-10-

testified that it was his intent that the co-borrower be the
general partner of Urban Woods, despite what Pls. Exh. 5
might otherwise indicate.  Mr. Graham expressed that it was
sometimes confusing to keep track of which "Pan American"
entity was which because there were so many of them.

32.  Mr. Graham also disputed having ever seen Pls.
Exh. 7, the Amended and Restated Limited Partnership
Agreement of Urban Woods on Commerce, Ltd. (the "Urban Woods
LP Agreement"), which reflected that it was PACC 1996, and
not PACC, that was the general partner of Urban Woods.  Mr.
Graham testified that he did not recall whether his attorney
saw the Urban Woods LP Agreement prior to entering into the
deal with Mr. Wood, but volunteered that his attorneys have
it now.

33.  Mr. Wood testified, on the other hand, that he
provided a copy of the Urban Woods LP Agreement to Messrs.
Graham and Tolson through Mr. Graham's counsel, Mr.
Grindinger, who also prepared the net profits agreement
between Messrs. Graham and Tolson and Mr. Wood and PACC
1996.  Pls. Exh. 14.

34.  Mr. Wood testified that he told Mr. Graham and Mr.
Michaux Nash, the President of Dallas National Bank, that it
should be PACC 1996 as co-borrower and not PACC, but that

for some reason they wanted PACC as a co-borrower, so they documented the Loan that way.

35.   Mr. Tolson testified that he did not have any contact with Mr. Wood prior to the closing of the Dallas National Bank Loan in November of 2000 and that all information he obtained regarding the Loan and the pledge of the Property came from Mr. Graham.

**The Intended Use of the Dallas National Bank Loan—Regardless of the Named Borrowers**

36.   Regardless of the named borrowers, Mr. Michaux Nash, president of Dallas National Bank, testified that the Loan proceeds were intended to be used to fund the Urban Woods project.

37.   Regardless of the named borrowers, Mr. Graham also testified that the Loan proceeds were intended to be used to fund the Urban Woods project.

38.   Regardless of the named borrowers, Mr. Tolson also testified that the Loan proceeds were intended to be used to fund the Urban Woods project.

39.   Mr. Wood contended at trial that the proceeds of the Dallas National Bank Loan were for his general business use, but the court earlier determined (after notice and a hearing), by order entered March 12, 2007, granting

Plaintiffs' Motion for Partial Summary Judgment or Judgment on the Pleadings, that Mr. Wood *admitted* in his Answer that the proceeds of the Dallas National Bank Loan (again, regardless of the named borrowers) were intended to be used for Urban Woods and for no other purpose. *See* Answer filed May 24, 2004 [Doc. No. 18] at ¶ 4 ("Paragraph 10 of Plaintiffs' Amended Complaint is admitted,[4] except that Defendant believes that the loan was made to PACC, with Defendant as guarantor"); see also Order entered March 12, 2007 [Doc. No. 106] at p.2.

40. Moreover, Mr. Wood admitted at trial that he was aware that Mr. Graham was not interested in providing blanket funding in order to aid Mr. Wood in a general reorganization of his businesses. Mr. Wood testified that Mr. Graham expressed interest in being involved with but one of Mr. Wood's projects, specifically, the Urban Woods project. So, to the extent that the deemed admission in Mr. Wood's Answer, as ordered by the court on March 12, 2007, does not completely foreclose the argument that the Dallas National Bank Loan proceeds were intended to be used for Mr.

---

[4] Paragraph 10 of the Plaintiffs' First Amended Complaint, which Defendant's Answer admitted, averred, among other things, that "The proceeds of the loan from Dallas National Bank were to be used as part of the construction costs of Urban Woods (hereinafter, referred to as "Project"), a luxury townhome development in the 3700 and 3800 blocks of Commerce Street in Dallas, Texas."

Wood's general business purposes, the court finds that the credible testimony (including some of Mr. Wood's own testimony)[5] was consistent with the notion that the Dallas National Bank Loan and the pledge of the Property were intended to support only the Urban Woods project.[6]

### Actual Use of the Loan Proceeds

41. The lion's share of the proceeds of the Dallas National Bank Loan were, in fact, *not* used to fund the Urban Woods project construction. The evidence reflects that Mr. Wood essentially used the Loan proceeds as a general purpose line of credit to pay whatever general business or personal expenses he deemed fit.

42. Urban Woods, as well as its general contractor, PA Group, ultimately filed their own separate bankruptcy cases.

---

[5] The documentary evidence submitted at trial (showing, among other things, extensive communications among the parties regarding the Urban Woods project, including financial information for it) also supports this finding. Pls. Exhs. 1 & 4-9.

[6] Much deliberation undergirds this finding by the court. The court was troubled by the lack of evidence to explain simply why Urban Woods had not been the named borrower on the Loan. The court was equally troubled why a separate corporate entity, PACC—which was not an owner of Urban Woods—would end up being a named borrower on a Loan, the proceeds of which were not intended for its use or benefit. Troubled as this court was, the credible evidence, as well as the admission in Debtor's Answer, nevertheless support a finding that the Loan was intended for the completion of the Urban Woods project. The court believes that it was sloppiness, more than anything else, that resulted in *PACC* being a co-borrower on the Loan, and that the intention had been for *PACC 1996* (*i.e.,* the general partner of Urban Woods) to be the named co-borrower with Mr. Wood. The court also conjectures (in the face of a dearth of evidence on this point) that Urban Woods itself, with a secured construction loan in place, had no borrowing ability/capacity.

**Easy Come Easy Go:  Dissipation of the Loan Proceeds from the Debtor's Personal Bank Account in the Two-Month Period After the Loan**

43.  The net proceeds of the Dallas National Bank Loan, which evidence indicated amounted to $242,381.09, were distributed on November 3, 2000, at closing, by a check from Dallas National Bank made payable to PACC and Mr. Wood.  Mr. Wood, on November 6, 2000, deposited $242,000 of the Loan proceeds into his personal bank account at Bank of Texas (the "BOT Personal Account") and kept $381.09 in cash.  Pls. Exhs. 30 & 33.[7]  At the date the Loan proceeds were deposited into the BOT Personal Account, the account balance was $5,525.96.

44.  According to the bank statements for the BOT Personal Account (Pls. Exhs. 30-32), from November 7, 2000, the date that the deposit of the Loan proceeds was posted, through November 19, 2000, checks in the amount of $228,178.65 were paid from the BOT Personal Account.  Pls. Exh. 30.  Then, from November 20, 2000 through December 19, 2000, checks in the amount of $79,988.32 were paid from the BOT Personal Account.  Pls. Exh. 31.  Then, from December 20, 2000 through January 21, 2001, checks in the amount of $30,442.89 were paid from the BOT Personal Account.  During

---

[7] The bank recorded the deposit of the Loan funds on November 7, 2000. *See* Pls. Exh. 30.

this same time frame, certain deposits were made into the BOT Personal Account, although the deposits were not anywhere as significant as the Loan proceeds.

45. This court is faced with a quandary of how and whether it should attempt to "trace" the Loan proceeds upon their receipt by the Debtor. The court must—since this adversary proceeding hinges on the allegation that the Loan proceeds were supposed to be used for Urban Woods' construction but were not—review the evidence to ascertain how the Loan proceeds were indeed used (for Urban Woods, or not?). The quandary arises because the Loan proceeds were not segregated into a separate account. As previously mentioned, the Loan proceeds were deposited into the BOT Personal Account and were thereafter commingled with other funds and subsequent deposits. Numerous disbursements were made from the commingled funds. Disbursements were made from the BOT Personal Account for everything from IRS payments for Mr. Woods' personal taxes, to birthday and Christmas gifts,[8] to payments to a shoe store, with some occasional payments to more legitimate-sounding business payees. What is the appropriate way to trace the Loan

---

[8] Checks written for birthday and Christmas gifts are discernable from certain notes made on the memo lines of certain checks.

proceeds, when cash is fungible and the Debtor made no effort to account for or segregate the Loan proceeds?

46.   One approach is to apply the "lowest intermediate balance" methodology that some courts have utilized in the similar context of tracing trust funds deposited in commingled accounts.  *See In re Al Copeland Enterprises, Inc.*, 991 F.2d 233 (5th Cir. 1993) (applying the lowest intermediate balance test to trace State taxes held in trust by the debtor); "In cases where trust funds have been commingled with other funds, courts have applied [the lowest intermediate balance] test to determine if the funds can be traced."  *United States v. McConnell (In re Flying Boat, Inc.)*, 258 B.R. 869, 875 (N.D. Tex. 2001).  "Under this test, if the balance of cash on hand on any interim day was less than the amount of trust fund claims, then the trust fund claims are limited to that 'lowest intermediate balance.'"  Specifically, the court could simply look at the balances of the accounts[9] in which the Loan proceeds were deposited, and note at which points the balances dropped to the lowest points, and use this as a way to determine when the Loan proceeds must have been exhausted.  For example, looking at the BOT Personal Account, into which the $242,000

---

[9] As will later be explained, a portion of the Loan proceeds were later transferred to a second account.

-17-

of net Loan proceeds were originally deposited (again, the deposit was posted on November 7, 2000), this account balance dropped to $19,747.31 on November 15, 2000, due to a flurry of checks presented after the Loan proceeds were deposited. Pls. Exh. 30. Therefore, the court would surmise that, at most, $19,747.31 of Loan proceeds were left in the BOT Personal Account on November 15, 2000. Then, turning to the bank statement for the BOT Personal Account in the next month, after various deposits and checks were made/issued, the account balance dropped to $2,268.40 on December 4, 2000. Pls. Exh. 31. Therefore, the court would surmise that, at most, $2,268.40 of Loan proceeds were left in the BOT Personal Account on December 4, 2000. Finally, turning to the bank statement for the BOT Personal Account in the next month, after various deposits and checks were made/issued, the account balance dropped to $1,188.59 on December 27, 2000. Pls. Exh. 32. Therefore, the court would surmise that, at most, $1,188.59 of Loan proceeds were left in the BOT Personal Account on December 27, 2000. The parties did not submit into evidence bank statements for the BOT Personal Account for periods after January 21, 2001. However, it is clear from Pls. Exh. 32 that, as of December 27, 2000, the Loan proceeds had been nearly, if not

-18-

entirely, exhausted (at most $1,188.59 of Loan proceeds could have been left at this point).

47. The court will adopt this "lowest intermediate balance" approach and will next turn to the evidence showing what checks were issued out of the BOT Personal Account from the date that the Loan proceeds were deposited (November 7, 2000) through December 27, 2000 (the point at which the BOT Personal Account was at its lowest intermediate balance).

**<u>Checks Paid from Funds in the BOT Personal Account from November 7, 2000, the Date that the Loan Proceeds were a Recognized Deposit, through November 19, 2000</u>**[10]

48. Below is a listing of all such checks:

a. On November 1, 2000, Mr. Wood issued a check (check number 1052), payable to **American Express**, in the amount of $1,029 (clearing the bank on November 7, 2000).[11]

b. On October 15, 2000 and November 13, 2000, respectively, Mr. Wood issued two checks (check number 1050, clearing the bank on November 13, 2000, in the amount of $5,000; and check number 1064, clearing the bank on November 15, 2000, in the amount of $4,000),[12] both payable to **Fidelity Investments**.

c. On November 6, 2000, Mr. Wood issued a check (check number 1053), payable to **PACC**, in the amount of

---

[10] All information summarized in this subsection was submitted as part of Pls. Exh. 30, unless otherwise noted.

[11] Certain of these checks were actually written in late October 2000, prior to the Dallas National Bank Loan proceeds actually being deposited in the BOT Personal Account, but did not actually clear until the Loan proceeds were in the account.

[12] This check had "IRA Sunny [illegible]" on the memo line.

$120,000, (clearing the bank on November 8, 2000) (Pls. Exh. 34).[13]

     d. On November 7, 2000, Mr. Wood issued a check (check number 1053) payable to **Westdale Properties Investment, Ltd.** (another of his business entities, connected with the Motor Street project) in the amount of $51,875 (Pls. Exh. 35), with "payoff loans" on the memo line.

     e. On November 7, 2000, Mr. Wood issued a check (check number 1060) payable to **Ruth Wagner** in the amount of $25,000 (Pls. Exh. 36), which Mr. Wood testified was in repayment of a loan she had made to him, personally. Mr. Wood also issued another check to **Ruth Wagner** on November 7, 2000, (check number 1061) in the amount of $1,880.

     f. On November 7, 2000, Mr. Wood issued a check (check number 1055) payable to **Tammy Wood** in the amount of $5,000.

     g. On November 7, 2000, Mr. Wood issued a check (check number 1057) payable to **United Texas Bank** in the amount of $3,332.60.

     h. On November 7, 2000, Mr. Wood issued a check (check number 1058) payable to the **IRS** in the amount of $9,045. The memo line on the check to the IRS reflects a social security number that is identical to the social security number on file with this court as Mr. Wood's social security number.

     i. On November 13, 2000, Mr. Wood issued a check (check number 1065) payable to **Johnston & Murphy** in the amount of $440.04.

     j. On November 15, 2000, Mr. Wood issued a check (check number 1068) payable to "**Cash**" in the amount of $200.

---

[13] This $120,000 in Loan proceeds paid over to PACC will be discussed further, *infra*, when the court analyzes PACC's bank records.

k. Mr. Wood also made the following **unidentified payments**:[14] on November 1, 2000 (check number 1051) (clearing on November 8, 2000) in the amount $377.01 (payee appears to be something like "Jeweler National [indecipherable]") and on November 6, 2000 (check number 1048) (clearing on November 7, 2000) in the amount of $1,000.

49. In all, after the $242,000 of Loan proceeds were deposited into the BOT Personal Account by Mr. Wood on November 6, 2000 (deposit recognized on November 7, 2000), $228,178.65 in funds exited the BOT Personal Account in roughly two weeks time by way of checks written by Mr. Wood. Because the court cannot determine to whom or for what purpose check numbers 1051 and 1048 were written (see paragraph 48k above), the court gives Mr. Wood the benefit of the doubt concerning those sums and finds that the total of $1,377.01 may have been used in support of Urban Woods. In other words, Plaintiffs did not meet their burden of proving by a preponderance of the evidence that this amount of the Dallas National Bank Loan proceeds was *not* used to support Urban Woods. However, this court determines that the Plaintiffs have met their burden of proof, by a preponderance of the evidence, that all other funds that

---

[14] To the extent that payments by check set forth herein are described as "unidentified payments" or written to "unknown" recipients, such recipients are unidentified or unknown because the name written in the "payee" line of the copies of the checks provided to the court is illegible and there was no testimony illuminating who the recipient may be.

exited the BOT Personal Account from November 7-19, 2000
with the exception of the $120,000 paid over to PACC (see
paragraph 48c above), which the court will address with
further specificity herein, were expended on general
business expenses unrelated to Urban Woods (*e.g.,* the
Westdale project), personal or other business debts of Mr.
Wood (American Express, IRS, Ruth Wagner), personal
investment (Fidelity, United Texas Bank), or personal
expenditures (Johnston & Murphy, Tammy Wood, cash) unrelated
to Urban Woods.  In other words, the Plaintiffs have met the
burden of showing payments from Loan proceeds that appear to
be wholly unrelated to Urban Woods, and the Debtor did
nothing to rebut this appearance or explain that the
payments might somehow have been in support of Urban Woods.

**Checks Paid from Funds in the BOT Personal Account from
November 20, 2000 through December 19, 2000**[15]

50.  What Loan proceeds were left in the BOT Personal
Account as of November 19, 2000 were quickly further
dissipated by mid-December 2000 as set forth below.  The BOT
Personal Account statement for the period of November 20,
2000 to December 19, 2000 shows a beginning balance of
$20,147.31.  Checks paid from funds in the BOT Personal

---

[15] All information summarized in this subsection was submitted as part
of Pls. Exh. 31, unless otherwise noted.

Account during the November 20, 2000 through December 19, 2000 time frame are summarized below:

a. Check Number 1054, dated November 6, 2000 (clearing the bank on December 4, 2000), in the amount of $500, payable to an individual with the surname "**Snyder**" with the phrase "Happy Birthday!" written in the memo line;

b. Check Number 1062, dated November 11, 2000, in the amount of $510.97, payable to **Home Entertainment**, with the words "pays in full" in the memo line;

c. Check Number 1063, dated November 11, 2000, in the amount of $1,000, payable to **Citibank Advantage**;

d. Check Number 1066, dated November 14, 2000, in the amount of $1,000, payable to **American Express**;

e. Check Number 1067, dated November 14, 2000, in the amount of $1,945, payable to **Compass Bank**, with the words "pay off" and an account number written in the memo line;

f. Check Number 1069, dated November 14, 2000, in the amount of $339, payable to **First Bankcard Center,** with an account number written in the memo line such that it appears that it is in payment of an account;

g. Check Number 1070, dated November 14, 2000, payable to **Peterson's Hunting**, in the amount of $17.94;

h. Check number 1071, dated November 14, 2000, payable to **VFW**, in the amount of $25;

i. Check Number 1072, dated November 14, 2000, payable to **Marine Corps Asso.** [sic] in the amount of $25;

j. Check Number 1073, dated November 15, 2000, in the amount of $500, payable to **Bank of America**;

k. Check Number 1074, dated November 19, 2000, in the amount of $4,000, payable to **Sunny Wood**;

l.    Check Number 1075, dated November 16, 2000, in the amount of $440.05, payable to **American Express**;

m.    Check Number 1076, dated November 22, 2000, in the amount of $20,000, payable to **Bank of Texas** in order to purchase a seven-month certificate of deposit from Bank of Texas;

n.    Check Number 1077, dated November 25, 2000, in the amount of $296.61, payable to **Riverhill Country Club**;

o.    Check Number 1078, dated November 28, 2000, in the amount of $1,075.95, payable to **Ray's Hardware**;

p.    Check Number 1079, dated November 29, 2000, in the amount of $2,000, payable to **American Flyers**;

q.    Check Number 1080, dated December 6, 2000, in the amount of $40,000, payable to **Bank of Texas** in order to purchase a certificate of deposit from Bank of Texas;[16]

r.    Check Number 1081, dated December 12, 2000, in the amount of $2,000, payable to **American Express**;

s.    Check Number 1083, dated December 12, 2000, in the amount of $175, payable to **Sally Morgan**;

t.    Check Number 1085, dated December 13, 2000, in the amount of $937.80, payable to **Capital One**;

u.    Check Number 1086, dated December 13, 2000, in the amount of $1,000, payable to **Citibank Advantage**;

v.    Check Number 1087, dated December 14, 2000, in the amount of $2,000, payable to **American Flyers**, with the phrase "flight training" in the memo line;

w.    Check Number 1089, dated December 16, 2000, in the amount of $200, payable to **Antonio Ramos**, with "Party Cleanup—Company" in memo line.

---

[16] This certificate of deposit corresponds with a check written from the PACC account to Mr. Wood on December 5, 2000.  See Pls. Exhs. 96 & 98.

51.  Once again, it appears to this court that
Plaintiffs have met their initial burden, by preponderance
of the evidence, in that it appears that none of the checks
written from the BOT Personal Account from the November 20,
2000 to December 19, 2000 period were written in support of
the Urban Woods project.  The checks written in the November
20, 2000 to December 19, 2000 time period appear to be
written in payment of personal debts and expenses of Mr.
Wood or, with regard to $60,000, for the personal investment
of Mr. Wood in certificates of deposit (see paragraph 50m
and 50q above).  The Debtor did nothing to rebut the
appearance or explain that the payments might somehow have
been in support of Urban Woods.

**Checks Paid from Funds in the BOT Personal Account from
December 20, 2000 through January 21, 2001**[17]

52.  The BOT Personal Account statement for the period
of December 20, 2000 to January 21, 2001 shows a beginning
balance of $7,758.99 and deposit of $25,915.23—for a total
of $33,674.22 of available funds during that time period.
Debits and checks from the BOT Personal Account for the
period of December 20, 2000 to January 21, 2001 equal
$30,442.89, leaving an ending balance of $3,231.33.  (See

---

[17] All information summarized in this subsection was submitted as part
of Pls. Exh. 32, unless otherwise noted.

Pls. Exh. 32.)  Checks written by Mr. Wood during the

December 20, 2000 through January 21, 2001 time frame from

the BOT Personal Account are as follows:

      a.   Check Number 1082, clearing the bank on
December 21, 2000, in the amount of $2,000 to an **unknown
recipient**.[18]

      b.   Check Number 1084, dated December [?], 2000,
in the amount of $48.33 To the **Dallas Morning News.**

      c.   Check Number 1088, dated December 14, 2000,
in the amount of $4,000 to **Sunny Wood.**

      d.   Check Number 1090, dated December [?], 2000,
in the amount of $200 to an **unknown individual.**

      e.   Check Number 1091, dated December 19, 2000,
in the amount of $48.33 to **Glo Cleaners**.

      f.   Check Number 1092, dated December 19, 2000,
in the amount of $200 to an individual with the first name
"**Amanda**" with the phrase "**Thank you!**" written in the memo
line.

      g.   Check Number 1093, dated December 20, 2000,
in the amount of $500 to **Bank of America** with a credit card
number in the memo line.

      h.   Check Number 1094, dated December 20, 2000,
in the amount of $200 to an individual with the surname
"**Snyder**" with the phrase "**Merry Xmas**" written in the memo
line.

      i.   Check Number 1095, dated December 21, 2000,
in the amount of $573.57 to **Sharper Image**.

---

[18] A copy of check number 1082 is not among the exhibits provided to the
court, but this check number and amount are reflected on the first page
of Pls. Exh.  32.

j.    Check Number 1096, clearing the bank on January 3, 2001, in the amount of $200 to an **unknown recipient**.[19]

k.    Check Number 1097, dated January 3, 2001, in the amount of $2,000 to **Sunny Wood**.

l.    Check Number 1098, dated January 3, 2001, in the amount of $43.73 to **Glo Cleaners**.

m.    Check Number 1099, dated January 3, 2001, in the amount of $1,357.59 to **Coddell Electric** with the word **"tracklights"** in the memo line.

n.    Check Number 1100, dated January 3, 2001, in the amount of $1,174.80 to the **City of Dallas** with an account number listed in the memo line.

o.    Check Number 1101, undated, in the amount of $889.97 to **David Childs, Tax Assessor-Collector** with the same account number listed in the memo line as is listed in the memo line of Check Number 1100.

p.    Check Number 1102, dated January 3, 2001, in the amount of $2,869.48 to **Richardson Independent School District** with an account number written in the memo line.

q.    Check Number 1103, dated January 3, 2001, in the amount of $5,192.27 written to **American Express**.

r.    Check Number 1104, dated January 3, 2001, in the amount of $200 written to **Bank of Texas**.

s.    Check Number 1105, dated January 6, 2001, in the amount of $978.42 written to **Tweeter** with the phrase **"Sony DVD"** in the memo line.

t.    Check Number 1106, dated January 9, 2001, in the amount of $1,766.23 written to **Pan American Group** with an illegible phrase in the memo line.

---

[19] A copy of check number 1096 is not among the exhibits provided to the court, but this check number and amount are reflected on the first page of Pls. Exh. 32.

u. Check Number 1107, dated January 14, 2001, in the amount of $1,000 to **American Flyer** with the phrase "**flight training**" in the memo line.

v. Check Number 1108, dated January 15, 2001, written to **Sunny Wood** in the amount of $5,000.

53. Once again, it appears to this court that Plaintiffs have met their initial burden, by preponderance of the evidence, in that it appears that none of the checks written from the BOT Personal Account from the December 20, 2000 to January 21, 2001 period[20] (with the exceptions noted in this paragraph below) were written in support of the Urban Woods project, but, rather, were written in payment of personal debts and expenses of Mr. Wood. The Debtor did nothing to rebut the appearance, or explain that the payments might somehow have been in support of Urban Woods. One exception is that, to the extent that it is unclear to whom a check may have been written or for what purpose, the court gives the benefit of the doubt to Mr. Wood. In other words, the Plaintiffs did not meet their burden of proving by a preponderance of the evidence that these amounts of the Loan proceeds represented by these checks were not used to support Urban Woods. Accordingly, the court finds that

---

[20] Recall that as of December 27, 2000, the BOT Personal Account has already reached its lowest intermediate balance of $1188.59, but, due to subsequent deposits, checks continue to be written and paid from the account. In any event, for purposes of the court's analysis, these checks after December 27, 2000, are largely irrelevant.

$2,400 (as reflected by Check Numbers 1082, 1090, and 1096;
see paragraphs 52a, d and j, respectively, above) of the
funds expended in the December 20, 2000 to January 21, 2001
time frame may have been expended in support of Urban Woods.
Also the court finds that the $1,766.23 reflected by Check
Number 1106 to Pan American Group (see paragraph 52t above)
may have been expended in support of Urban Woods, because
Pan American Group was the general contractor of the Urban
Woods project.  In other words, the Plaintiffs did not meet
their burden of proof by a preponderance of the evidence
that this $1,766.23 was not used for Urban Woods.

**Recap of Activity of BOT Personal Account and the Amount of Funds Potentially Used for Urban Woods**

54.  Returning again to the tracing principle of
"lowest intermediate balance," the court earlier determined
that all but $1,188.59 of Loan proceeds must have been
exhausted as of December 27, 2000, the date that the BOT
Personal Account balance dropped, according to Pls. Exhs.
30-32, to its lowest balance, after deposit into the account
of the $242,000 of Loan proceeds.

55.  Summarizing paragraphs 48-53 above, the court
finds that the Plaintiffs met their burden of establishing
by a preponderance of the evidence that:  (a) all Loan

-29-

proceeds except for **$1,188.59** had been dissipated from the BOT Personal Account in which they were deposited by December 27, 2000; and (b) all disbursements made from the BOT Personal Account were not expended for Urban Woods purposes except Plaintiffs did not meet their burden as to Check Number 1053 (**$120,000** check made payable to PACC—see paragraph 48c above)[21]; Check Number 1051 (**$377.01** check made payable to unidentified payee—see paragraph 48k above); Check Number 1048 (**$1,000** check made payable to unidentified payee—see paragraph 48k above); Check Number 1082 (**$2,000** check made payable to unknown payee—see paragraph 52a above); Check Number 1090 (**$200** check made payable to unknown payee—see paragraph 52d above); Check Number 1096 (**$200** check made payable to unknown payee—see paragraph 52j above); Check Number 1106 (**$1,766.23** check made payable to Pan American Group—see paragraph 52t above). Thus, the court finds that, before analyzing what happened to the $120,000 of Loan proceeds that were paid by check number 1053 to PACC from the BOT Personal Account (see next subsection below), the Plaintiffs have met their burden of showing that all but **$126,731.82** of Loan proceeds (**$1,188.59**

---

[21] This $120,000 check to PACC is further addressed starting in paragraph 56 below.

+ **$120,000** + **$377.01** + **$1,000** + **$2,000** + **$200** + **$200** + **$1,766.23**) were used for non-Urban Woods purposes.

**The PACC Bank of America Account**

56.  As first referenced in paragraph 48c above, on November 6, 2000 (immediately upon depositing the Loan proceeds into his BOT Personal Account), Mr. Wood issued a check (check number 1053), payable to PACC, in the amount of $120,000, (clearing the BOT Personal Bank Account on November 8, 2000).  Pls. Exh. 34.

57.  Pls. Exhs. 96 through 99 are bank statements and cancelled checks from the PACC Bank of America account into which the $120,000 was deposited (the "PACC BOA Account"). Specifically, Pls. Exh. 96 consists of three bank statements from the PACC BOA Account relating to the November and December of 2000 and January of 2001 time periods.  Pls. Exhs. 97, 98, and 99 are copies of cancelled checks and deposit slips from the PACC BOA Account.

58.  Pls. Exh. 96 shows a deposit in the amount of $120,000 into the PACC BOA Account, which posted on November 7, 2000.  Pls. Exh. 30 contains a copy of the $120,000 check written from Mr. Wood's BOT Personal Account (Check Number 1053, dated November 6, 2000) written to "Pan American Capital Corp." with the phrase "Loan Proc." written in the

memo line.  Connecting the dots, it is obvious that the
$120,000 November 7, 2000 deposit into the PACC BOA Account,
as reflected by Pls. Exh. 96, is the $120,000 Loan proceeds
check written from Mr. Wood's personal account on November
6, 2000.

59.  As lamented earlier, this court is once again
confronted with the quandary of how and to what extent it
should attempt to "trace" the $120,000 of Loan proceeds upon
their deposit into the PACC BOA Account.  Once again, the
court must—since this adversary proceeding hinges on the
allegation that the Loan proceeds were supposed to be used
for Urban Woods' construction but were not—review the
evidence to ascertain how the Loan proceeds were indeed used
(for Urban Woods, or not?).  As with the BOT Personal
Account, the quandary exists because the $120,000 of Loan
proceeds were not segregated.  Like the Loan proceeds
deposited into the BOT Personal Account, the $120,000 of
Loan proceeds that were transferred/deposited into the PACC
BOA Account were thereafter commingled with other funds and
subsequent deposits.  Numerous deposits and disbursements
were made into and from the commingled funds.  The court
will once again apply the "lowest intermediate balance"
methodology here, and follow the balance of the PACC BOA

Account, and note at which point the balance dropped to the lowest level, and use this as a way to determine when the $120,000 of Loan proceeds must have been exhausted. Looking at the PACC BOA Account (again, the $120,000 deposit was posted on November 7, 2000), this account balance dropped to $5,463.49 on November 27, 2000, due to numerous checks written and presented after the $120,000 of Loan proceeds were deposited. Pls. Exh. 96. Therefore, the court would surmise that, at most, $5,463.49 of the $120,000 of Loan proceeds were left in the PACC BOA Account on November 27, 2000 (a mere three weeks after their deposit into the account). Then, turning to the bank statement for the PACC BOA Account in the next month, after various deposits and checks were made/issued, the account balance dropped to $1,271.22 on December 21, 2000. Pls. Exh. 96. Therefore, the court would surmise that, at most, $1,271.11 of Loan proceeds were left in the PACC BOA Account on December 21, 2000. Finally, turning to the bank statement for the PACC BOA Account in the next month, after various deposits and checks were made/issued, the account balance dropped to $128.41 on January 17, 2001. Pls. Exh. 96. Therefore, the court would surmise that, at most, $128.41 of the $120,000 of Loan proceeds were left in the PACC BOA Account on

-33-

January 17, 2001. The parties did not submit into evidence bank statements for the PACC BOA Account for periods after January 31, 2001. However, it is clear from Pls. Exh. 96 that, as of January 17, 2001, the $120,000 of Loan proceeds had been nearly, if not entirely, exhausted (at most $128.41 of Loan proceeds could have been left in the PACC BOA Account at this point).

60. The court will adopt this "lowest intermediate balance" approach, and will next turn to the evidence showing what checks were issued out of the PACC BOA Account from the date that the $120,000 of Loan proceeds were deposited into the PACC BOA Account (November 7, 2000) through January 17, 2001 (the point at which the PACC BOA Account was at its lowest intermediate balance).[22]

61. An examination of PACC's bank account records shows that the majority of the $120,000 of Loan proceeds were expended in support of PACC's general expenses and were not used in furtherance of the Urban Woods project. After the November 7, 2000 deposit of the $120,000 of Loan proceeds, PACC wrote the following checks from the PACC BOA

---

[22] The PACC BOA Account had an ending balance of $777.48 on January 31, 2001—the last balance that the available evidence shows.

-34-

Account (*see* Pls. Exhs. 96, 97, and 98) in November and December of 2000 and in January of 2001:[23]

a.   Check Number 1829, dated November 3, 2000 and clearing the bank on November 15, 2000, in the amount of $28,000 to **JDW, Inc.** for "Oct/Nov/Dec payments as agreed."[24]

b.   Check Number 1830, dated November 7, 2000 and clearing the bank on November 10, 2000, in the amount of $2,500 to **Deep Ellum Lofts** for "November Rent."

c.   Check Number 1831, dated November 7, 2000 and clearing the bank on November 10, 2000, in the amount of $10,818.26 to **Henry, Meier & Jones, L.L.P.**[25]

_____

[23] Pls. Exhs. 97, 98 and 99 include copies of checks that cleared prior to the deposit of the $120,000 Loan proceeds. Accordingly, for the purposes of analyzing what amounts of the $120,000, if any, were used in furtherance of the Urban Woods project, the court will ignore these checks as they could not possibly represent an expenditure of Loan proceeds deposited into the PACC BOA Account since they cleared the bank prior to the deposit of the Loan proceeds. Specifically, the court is ignoring Check Number 1812 dated October 23, 2000, Check Number 1813 dated October 23, 2000, Check Number 1826 dated November 1, 2000 and clearing the bank on November 2, 2000, and Check Number 1828 dated November 2, 2000 and clearing the bank on November 3, 2000.

[24] Check Number 1829 cleared the bank on November 15, 2000 (see Pls. Exh. 96), so although the date on the check predates the November 7, 2000 deposit of the Loan proceeds into the PACC BOA Account, it was paid with post-deposit funds.

[25] Henry, Meier & Jones, L.L.P. (a.k.a. Henry & Jones, L.L.P.) was the law firm that did a large amount of legal work for Mr. Wood and his entities and, in fact, was involved in negotiation of the agreement with the Plaintiffs to pledge the Property. See Pls. Exh. 6, which shows a fax stamped date from "Henry & Jones" of October 27, 2000. Accordingly, while the court cannot conclude that every amount paid to Henry, Meier during the November 7, 2000 to January 31, 2000 timeframe was in connection with the Urban Woods project, it is reasonable to conclude that these fees, paid the same date the Loan proceeds were deposited into the PACC BOA Account were legal fees incurred in connection with the negotiation of financing for the Urban Woods project.

d.    Check Number 1832, dated November 7, 2000 and clearing the bank on November 17, 2000, in the amount of $1,400 to **John Ankeny** (see Pls. Exhs. 96 and 98).[26]

e.    Check Number 1833, dated November 7, 2000 and clearing the bank on November 17, 2000, in the amount of $258.61 to **LeaseNet, Inc.**

f.    Check Number 1834, dated November 7, 2000 and clearing the bank on November 19, 2000, in the amount of $262.62 to **Lewis Wood.**

g.    Check Number 1835, dated November 7, 2000 and clearing on November 27, 2000, in the amount of $14,870 to **Maxwell Drever** as "interest on $250,000 loan."

h.    Check Number 1836, dated November 7, 2000 and clearing on November 10, 2000, in the amount of $255.17 to **Minolta Business Systems, Inc.**

i.    Check Number 1837, dated November 7, 2000 and clearing on November 15, 2000, in the amount of $250 to **Office Max.**

j.    Check Number 1838, dated November 7, 2000 and clearing on November 15, 2000, in the amount of $25 to **Postal Privilege.**

k.    Check Number 1839, dated November 7, 2000 and clearing on November 10, 2000, in the amount of $584.55 to **Rocio Valdelamar.**

l.    Check Number 1840, dated November 7, 2000 and clearing on November 10, 2000, in the amount of $4,500 to **Ron Wommack.**[27]

---

[26] The debtor testified that Mr. Ankeny did the accounting for the Urban Woods project.

[27] Mr. Wood testified that Mr. Wommack was the architect associated with the Urban Woods project and that Mr. Wommack also worked on the "Mitchell Building."

m.     Check Number 1841, dated November 7, 2000 and clearing on November 14, 2000, in the amount of $30 to **Sparkletts**.

n.     Check Number 1842, dated November 7, 2000 and clearing on November 10, 2000, in the amount of $1,079.98 to **Stream Realty Partners, LP**.

o.     Check Number 1843, dated November 7, 2000 and clearing on November 15, 2000, in the amount of $102.60 to **Teleglobe Business Solutions, Inc.**

p.     Check Number 1844, dated November 7, 2000 and clearing on November 10, 2000, in the amount of $1,828.98 to **The Pan American Group** with the phrase "Motor Street" written in the memo line.

q.     Check Number 1845, dated November 7, 2000 and clearing on November 14, 2000, in the amount of $429.13 to **TXU Electric**.

r.     Check Number 1846, dated November 7, 2000 and clearing on November 10, 2000, in the amount of $12,825.15 to **Zielinski Design Associates**.

s.     Check Number 1847, dated November 8, 2000 and clearing on November 16, 2000, in the amount of $4,415 written to **Malone Mortgage Co.** with the phrase "**Market Study**" written in the memo line.

t.     Check Number 1849,[28] dated November 9, 2000 and clearing on November 15, 2000, in the amount of $250 to **Rhonda G. Brown** for the "**Mitchell**[29] October accounting."

u.     Check Number 1850, dated November 10, 2000 and clearing the bank on December 1, 2000, in the amount of $3,500 to **Texas Capital Bank** with the phrase "**Appraisal/Full Settlement**" in the memo line.

---

[28] The check numbers skip check number 1848 here because it is a voided check. *See* Pls. Exh. 97.

[29] "Mitchell" refers to the Mitchell Building, one of Mr. Wood's real estate ventures.

v.   Check Number 1851, dated November 13, 2000 and clearing on November 22, 2000, in the amount of $3,750 to **James P. Graham**, one of the Plaintiffs, as payment of a "**finder's fee**" in connection with the Loan.

w.   Check Number 1852, dated November 13, 2000 and clearing on November 17, 2000, in the amount of $1,250 to **Ray S. Tolson, III**, one of the Plaintiffs, as payment of a "**finder's fee**" in connection with the Loan.

x.   Check Number 1853, dated November 13, 2000 and clearing on November 17, 2000, in the amount of $15,000 to **Henry S. Miller Commercial** with the phrase "**Settlement for Draw Note**" written in the memo line.

y.   Check Number 1854, dated November 13, 2000 and clearing on November 21, 2000, in the amount of $250 written to **Office Max**.

z.   Check Number 1855, dated November 13, 2000 and clearing on November 21, 2000, in the amount of $87.95 to **Pitney Bowes**.

aa.   Check Number 1856, dated November 16, 2000 and clearing on November 17, 2000, in the amount of $76.06 written to **Wolf Camera**.

bb.   Check Number 1857, dated November 21, 2000 and clearing on November 27, 2000, in the amount of $16.33 to **TXU Electric**.

cc.   Check Number 1858, dated November 21, 2000 and clearing on November 30, 2000, in the amount of $43.19, to **LeaseNet, Inc.**

dd.   Check Number 1859, dated November 21, 2000 and clearing on November 24, 2000, in the amount of $32 to **Courier Management Systems**.

ee.   Check Number 1860, dated November 21, 2000 and clearing on November 28, 2000, in the amount of $335.11 to **Fidelity Leasing, Inc.**

ff. Check Number 1861, clearing the bank on November 22, 2000, in the amount of $490.33.[30]

gg. Check Number 1862, dated November 21, 2000 and clearing the bank on November 27, 2000, in the amount of $16,000 to **Lewis Wood**.

hh. Check Number 1863, dated November 30, 2000 and clearing the bank on November 30, 2000, in the amount of $5,000 to **Lewis Wood**, as a **"director's fees."**

ii. Check Number 1864, dated January 30, 2000 and clearing the bank on December 1, 2000, in the amount of $14,500 to **Charles Ragan** as **"consulting fees/developer fees."**[31]

jj. Check Number 1865, dated December 1, 2000 and clearing the bank on December 6, 2000, in the amount of $1,070.73 to **Henry, Meier & Jones, L.L.P.**

kk. Check Number 1866, dated December 1, 2000 and clearing the bank on December 7, 2000, in the amount of $215.42 to **LeaseNet, Inc.**

ll. Check Number 1867, dated December 1, 2000 and clearing the bank on December 6, 2000, in the amount of $350.10 to **Lewis Wood** with the word "reimbursables" written in the memo line.

mm. Check Number 1868, dated December 1, 2000 and clearing the bank on December 8, 2000, in the amount of $28.86 to **Postal Privilege.**

nn. Check Number 1869, dated December 1, 2000 and clearing the bank on December 19, 2000, in the amount of

---

[30] Check Number 1861 appears on Pls. Exh. 96 on the November 2000 statement of the PACC BOA Account, but the court has not been provided with a copy of Check Number 1861 to know to whom the check was written or for what purpose, nor was there any testimony to that effect adduced.

[31] Check Number 1864's date is written "01/30/2000," but its check number sequence would put it after Check Number 1863, the date of which is written "11/30/2000," and before Check Number 1865, the date of which is written "12/01/2000." The court supposes that Check Number 1864 was intended to be dated "11/30/2000," and was probably written on November 30, 2000, especially since it cleared on December 1, 2000.

$100 to **Preservation Dallas** with the memo line "**Membership Dues/Renewal.**"

      oo.  Check Number 1870, dated December 1, 2000 and clearing the bank on December 11, 2000, in the amount of $519.60 to **Rocio Valdelamar.**

      pp.  Check Number 1871, dated December 1, 2000 and clearing the bank on December 7, 2000, in the amount of $102.84 to **Stream Realty Partners, LP.**

      qq.  Check Number 1872, dated December 1, 2000 and clearing the bank on December 7, 2000, in the amount of $794.42 to **Southwestern Bell.**

      rr.  Check Number 1873, dated December 1, 2000 and clearing the bank on December 5, 2000, in the amount of $143.96 to **Sunny Wood** with the memo line "reimbursables."

      ss.  Check Number 1874, dated December 1, 2000 and clearing the bank on December 11, 2000, in the amount of $94.52 to **Teleglobe Business Solutions, Inc.**

      tt.  Check Number 1875, dated December 1, 2000 and clearing the bank on December 11, 2000, in the amount of $141.11 to **The Manifest Group, Inc.**

      uu.  Check Number 1876, dated December 4, 2000 and clearing the bank on December 6, 2000, in the amount of $43,000 to **Lewis Wood.**[32]

      vv.  Check Number 1877, dated December 7, 2000 and clearing the bank on December 12, 2000, in the amount of $350 to **Rhonda G. Brown** for "**November Accounting.**"

      ww.  Check Number 1878, dated December 8, 2000 and clearing the bank on December 11, 2000, in the amount of $255.17 to **Minolta Business Systems, Inc.**

---

[32] This check for $43,000 corresponds to a deposit made by Mr. Wood to the BOT Personal Account on December 5, 2000, which funds, as discussed above, were expended for Mr. Wood's personal use.  On December 6, 2000, Mr. Wood took $40,000 out of the BOT Personal Account to purchase a certificate of deposit at Bank of Texas.  *See* Pls. Exh.  31.

xx. Check Number 1879, dated December 8, 2000 and clearing the bank on December 11, 2000, in the amount of $105.98 to **Minolta Business Systems, Inc.**

yy. Check Number 1880, dated December 8, 2000 and clearing the bank on December 13, 2000, in the amount of $15 to **Sparkletts**.

zz. Check Number 1881, dated December 8, 2000 and clearing the bank on December 14, 2000, in the amount of $483.04 to **TXU Electric**.

aaa. Check Number 1882, dated December 14, 2000 and clearing the bank on December 15, 2000, in the amount of $9,000 to **Lewis Wood** for "**director fees.**"[33]

bbb. Check Number 1883, dated December 14, 2000 and clearing the bank on December 20, 2000, in the amount of $250 to **Office Max**.

ccc. Check Number 1884, dated December 14, 2000 and clearing the bank on December 18, 2000, in the amount of $439.03 to **Minolta Business Systems, Inc.**

ddd. Check Number 1885, dated December 14, 2000 and clearing the bank on December 20, 2000, in the amount of $250 to **Office Max**.

eee. Check Number 1886, dated December 14, 2000 and clearing the bank on December 26, 2000, in the amount of $43.19 to **LeaseNet, Inc.**

fff. Check Number 1887, dated December 14, 2000 and clearing the bank on December 20, 2000, in the amount of $16.33 to **TXU Electric**.

ggg. Check Number 1888, dated December 14, 2000 and clearing the bank on December 18, 2000, in the amount of $296.14 to **Sunny Wood** with the word "reimbursables" in the memo line.

hhh. Check Number 1889, dated December 19, 2000 and clearing the bank on December 21, 2000, in the amount of

---

[33] This check corresponds to a deposit made by Mr. Wood to the BOT Personal Account on December 14, 2000. *See* Pls. Exh. 31.

$300 to **Pam Hall** with the phrase "**Christmas Bonus**" written in the memo line.

iii. Check Number 1890, dated December 21, 2000 and clearing the bank on December 26, 2000, in the amount of $22.76 to **Wolf Camera**.

jjj. Check Number 1891, dated December 22, 2000 and clearing the bank on January 2, 2001, in the amount of $2,522.23 to **GEAC/AMSI** with the word "renewal" in the memo line.

kkk. Check Number 1892, dated December 22, 2000 and clearing the bank on December 27, 2000, in the amount of $125 to **Hella Shrine Circus** with the word "donation" in the memo line.

lll. Check Number 1893, dated December 22, 2000 and clearing the bank on December 27, 2000, in the amount of $125 to **Shriner's Hospital** with the word "donation" in the memo line.

mmm. Check Number 1894, dated December 22, 2000 and clearing the bank on December 28, 2000, in the amount of $11.50 to **Courier Management Systems**.

nnn. Check Number 1895, dated December 22, 2000 and clearing the bank on December 22, 2000, in the amount of $2,500 to **Deep Ellum Lofts**.

ooo. Check Number 1896, dated December 22, 2000 and clearing the bank on December 28, 2000, in the amount of $335.11 to **Fidelity Leasing, Inc.**

ppp. Check Number 1897, dated December 22, 2000 and clearing the bank on January 2, 2001, in the amount of $24.99 to **Pam Hall** with the word "reimbursables" in the memo line.

qqq. Check Number 1898, dated December 22, 2000 and clearing the bank on January 5, 2000, in the amount of $2,073.35 to **Henry & Jones, LLP**.

rrr. Check Number 1899, dated December 22, 2000 and clearing the bank on January 2, 2001, in the amount of $215.42 to **LeaseNet, Inc.**

sss. Check Number 1900, dated December 22, 2000 and clearing the bank on December 29, 2000, in the amount of $137.78 to **Lewis Wood** with the word "reimbursables" in the memo line.

ttt. Check Number 1901, dated December 22, 2000 and clearing the bank on January 3, 2001, in the amount of $189.44 to **Precision Imaging Solutions**.

uuu. Check Number 1902, dated December 22, 2000 and clearing the bank on January 3, 2001, in the amount of $519.60 to **Rocio Valdelamar**.

vvv. Check Number 1903, dated December 22, 2000 and clearing the bank on December 28, 2000, in the amount of $785.03 to **Southwestern Bell**.

www. Check Number 1904, dated December 22, 2000 and clearing the bank on December 26, 2000, in the amount of $22 to **Sunny Wood**.

xxx. Check Number 1905, dated December 22, 2000 and clearing the bank on January 3, 2001, in the amount of $113.31 to **Teleglobe Business Solutions, Inc.**

yyy. Check Number 1906, dated December 22, 2000 and clearing the bank on January 2, 2001, in the amount of $157.95 to **The Manifest Group, Inc.**

zzz. Check Number 1907, dated December 28, 2000 and clearing the bank on December 29, 2000, in the amount of $4,000 to **Lewis Wood** for "**director fees**."

aaaa. Check Number 1908, dated January 3, 2001 and clearing the bank on January 4, 2001, in the amount of $4,500 to **Charles Ragan** for "**Consulting Fees – January**."

bbbb. Check Number 1909, dated January 4, 2001 and clearing the bank on January 5, 2001, in the amount of $250 to **Rhonda G. Brown** with the memo line "**December Accounting**."

-43-

cccc. Check Number 1910, dated January 8, 2001 and clearing the bank on January 12, 2001, in the amount of $2,560 to **CGU**.

dddd. Check Number 1911, dated January 8, 2001 and clearing the bank on January 10, 2001, in the amount of $255.17 to **Minolta Business Systems, Inc.**

eeee. Check Number 1912, dated January 8, 2001 and clearing the bank on January 16, 2001, in the amount of $250 to **Office Max**.

ffff. Check Number 1913, dated January 8, 2001 and clearing the bank on January 17, 2001, in the amount of $43.51 to **Pitney Bowes**.

gggg. Check Number 1914, dated January 8, 2001 and clearing the bank on January 17, 2001, in the amount of $184.50 to **Postal Privilege**.

hhhh. Check Number 1915, dated January 8, 2001 and clearing the bank on January 16, 2001, in the amount of $22.50 to **Sparkletts**.

iiii. Check Number 1916, dated January 8, 2001 and clearing the bank on January 11, 2001, in the amount of $864.81 to **Stream Realty Partners, LP**.

jjjj. Check Number 1917, dated January 8, 2001 and clearing the bank on January 12, 2001, in the amount of $613.94 to **TXU Electric**.

kkkk. Check Number 1918, dated January 8, 2001 and clearing the bank on January 12, 2001, in the amount of $23.45 to **Wolf Camera**.

llll. Check Number 1919, dated January 11, 2001 and clearing the bank on January 12, 2001, in the amount of $50 to **Rhonda G. Brown** for "**December Accounting**."

mmmm.  Check Number 1920, dated January 23, 2001 and clearing the bank on January 24, 2001, in the amount of $10,000 to **Lewis Wood** for "**director fees.**"[34]

nnnn.  Check Number 1921, dated January 24, 2001 and clearing the bank on January 30, 2001, in the amount of $121.75 to **Courier Management Systems.**

oooo.  Check Number 1922, dated January 24, 2001 and clearing the bank on January 30, 2001, in the amount of $335.11 to **Fidelity Leasing, Inc.**

pppp.  Check Number 1923, dated January 24, 2001 and clearing the bank on January 30, 2001, in the amount of $319.34 to **Landiscor, Inc.**

qqqq.  Check Number 1924, dated January 24, 2001 and clearing the bank on January 29, 2001, in the amount of $613.71 to **Minolta Business Systems, Inc.**

rrrr.  Check Number 1925, dated January 24, 2001, in the amount of $250 to **Office Max.**[35]

ssss.  Check Number 1926, dated January 24, 2001 and clearing the bank on January 30, 2001, in the amount of $789.93 to **Southwestern Bell.**

tttt.  Check Number 1927, dated January 24, 2001, in the amount of $82.17 to **Teleglobe Business Solutions, Inc.**[36]

---

[34] Recall that at this point the PACC BOA Account has already surpassed its lowest intermediate balance of $128.41 on January 17, 2001, but, due to subsequent deposits, checks continue to be written and paid from the account.  In any event, for purposes of the court's analysis, these checks after January 17, 2001, are largely irrelevant.

[35] Check Number 1925 does not appear on the PACC BOA Account statements (Pls. Exh. 96) for November or December of 2000 or January of 2001, but a copy of the check does appear in Pls. Exh. 99.  The court presumes that this check probably cleared in February of 2001.

[36] Check Number 1927 does not appear on the PACC BOA Account statements (Pls. Exh. 96) for November or December of 2000 or January of 2001, but a copy of the check does appear in Pls. Exh. 99.  The court presumes that this check probably cleared in February of 2001.

uuuu.  Check Number 1928, dated January 24, 2001 and clearing the bank on January 30, 2001, in the amount of $16.33 to **TXU Electric**.

vvvv.  Check Number 1929, dated January 30, 2001 and clearing the bank on January 31, 2001, in the amount of $2,500 to **Deep Ellum Lofts** for "January Rent."

62.  Mr. Wood testified that none of the checks listed in paragraph 61 above relate to PA Group as the general contractor for Urban Woods, nor did they related to Urban Woods in general.  However, the court believes that, at least with regard to certain items, Mr. Wood mis-spoke in making this generalized representation, since contrary evidence (including Mr. Wood's own testimony in certain instances) shows that some of these payments were *in fact*, or were *likely*, made in support of the Urban Woods project.

63.  Accordingly, the court finds that the following amounts paid from the PACC BOA Account were amounts paid in support or furtherance of the Urban Woods project:

a.  The evidence shows that checks written to Messrs. Graham and Tolson—totaling $5,000—were funds utilized in support of Urban Woods, in connection with the Loan, in that they were finder's fees paid to Messrs. Graham and Tolson in connection with the Loan.  *See* paragraphs 61.v and 61.w above.

b.  Ron Wommack was the architect on the Urban Woods project and $4,500 was paid to him in connection with the Urban Woods project by Check Number 1840 shortly after receipt of the Loan proceeds.  *See* paragraph 61.l above.

-46-

c.   John Ankeny was the accountant on the Urban Woods project and $1,400 was paid to him in connection with the Urban Woods project by Check Number 1932 shortly after receipt of the Loan proceeds. *See* paragraph 61.d above.

d.   Precision Imaging Solutions did all of the copying for the Urban Woods project, per Mr. Wood's testimony, and was paid $189.44 by Check Number 1901 dated December 22, 2000 from the Loan proceeds. *See* paragraph 61.ttt above.

e.   Henry, Meier & Jones, L.L.P. (a.k.a. Henry & Jones, L.L.P.) was paid, by Check Number 1831 dated November 7, 2000 the amount of $10,818.26 in connection with the Urban Woods project. *See* paragraph 61.c above.

f.   Because the court cannot determine to whom or for what purpose Check Number 1861 in the amount of $490.33 was written, the court gives the Debtor the benefit of the doubt concerning this amount and finds that $490.33 may have been used in support of Urban Woods. *See* paragraph 61.ff above.

64.  Regarding other business expenses of PACC as reflected in paragraph 61 above, Mr. Wood made vague references to certain expenses paid by PACC that were shared by all of his businesses, but he was not at all clear as to amounts or percentages of such expenses that were attributable to Urban Woods.

65.  With regard to all the other checks listed in paragraph 61, there is no contrary testimony or evidence to contradict Mr. Wood's testimony that the funds were not utilized to pay PA Group as general contractor for Urban Woods or for payment of Urban Woods' debts directly.

-47-

Accordingly, except for the amounts discussed in paragraph 63 above (which total $22,398.03), the court finds that the Plaintiffs proved by a preponderance of the evidence that the payments from the PACC BOA Account in the period from November 7, 2000 to January 31, 2000 were not made in connection with the Urban Woods project.

66. Accordingly, of the amounts expended by PACC from the PACC Bank of America Account from November 7, 2000 to January 31, 2001, $22,398.03 was used in furtherance of the Urban Woods project.

67. It should be noted that Mr. Wood presented his Def. Exh. 26, which is a demonstrative aid, a chart of payments made, starting on February 14, 2001 with a payment to Dallas National Bank from the BOT Personal Account and ending on January 8, 2003, allegedly in support of the Urban Woods project. One of such payments was made from the PACC BOA Account on May 1, 2001.

68. Mr. Wood asserts that these payments reflected on Def. Exh. 26 prove that significant Loan proceeds were used for the Urban Woods project. However, as set forth above, all of the Loan proceeds were gone[37] before Mr. Wood and/or PACC made the first payment as reflected by Def. Exh. 26.

_____

[37] At least all but $1,188.59 in the BOT Personal Account and all but $128.41 in the PACC BOA Account.

-48-

The payments reflected by Def. Exh. 26 were made with
different funds, not the Loan proceeds. Accordingly, Def.
Exh. 26 shows only (to the extent that it shows anything)
that payments were (or may have been) made by Mr. Wood and
PACC in support of Urban Woods from their own funds
beginning in February of 2001 and continuing until January
of 2003. Moreover, Def. Exh. 26 merely shows loan
repayments made to Dallas National Bank—not payments made
toward construction or completion of Urban Woods—the
intended purpose of the Loan proceeds.

69. The total amount of Loan proceeds that may have
been utilized in furtherance of the Urban Woods project (in
other words, the total amount of Loan proceeds that
Plaintiffs did *not* meet their burden of establishing were
*not* used for Urban Woods) is $29,258.26 (computed by adding
$6,731.82, with regard to the BOT Personal Account,[38] plus
$22,526.44, with regard to the PACC BOA Account).[39] In
other words, Plaintiffs met their burden of proof of showing
that at least all of the Loan proceeds *except this amount*

_____

[38] *See* paragraph 55 herein ($6,731.82 is computed by subtracting $120,000
from $126,731.82—since the $120,000 is separately dealt with in
paragraph 61).

[39] *See* paragraphs 63-65 herein ($22,526.44 is computed by adding the
$22,398.03 of payments discussed in paragraphs 63-65, with $128.41—the
lowest intermediate balance in the PACC BOA Account, the ultimate use of
which balance is indeterminable from the evidence).

-49-

were not utilized for Urban Woods. The remainder, $213,122.83, of the Loan proceeds was utilized for other purposes— primarily Mr. Wood's personal use and to fund the general business operations of PACC.

### CONCLUSIONS OF LAW

1.    Section 523(a)(2) provides that:

A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt for money, property services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

2.   Section 523(a)(2)(B) provides that:

A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by use of a statement in writing (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B).

3.   Section 523(a)(4) provides that "A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt for fraud or defalcation

-50-

while acting in a fiduciary capacity, embezzlement or larceny." 11 U.S.C. § 523(a)(4).

4. In the Amended Complaint, the Plaintiffs make five allegations to support their claim that the debt owed to them by Mr. Wood is nondischargeable, pursuant to either section 523(a)(2)(A), 523(a)(2)(B), or 523(a)(4) of the Bankruptcy Code:

a. That Mr. Wood falsely represented that the Loan proceeds would be used as operating capital for PACC 1996 in the Urban Woods project;

b. That Mr. Wood falsely represented that the Loan proceeds would be deposited in a separate account at Dallas National Bank;

c. That Mr. Wood falsely represented that the Plaintiffs would be supplied with regular financial reports on the Urban Woods project;

d. That Mr. Wood falsely represented that he had sufficient funds to complete the project; and

e. That Mr. Wood failed to disclose to the Plaintiffs that the general contractor on the Urban Woods project was a company controlled by Mr. Wood.

## Standard of Proof

5.   The standard of proof for a plaintiff in an action
under section 523(a) is preponderance of the evidence.
*Grogan v. Garner*, 498 U.S. 279, 286 (1991); *RecoverEdge,*
*L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995).
Exceptions to discharge are construed in favor of the debtor
with a view to the policy that the Bankruptcy Code provides
a fresh start to debtors.  *McCoun v. Rea (In re Rea)*, 245
B.R. 77, 84 (Bankr. N.D. Tex. 2000).

## 11 U.S.C. § 523(a)(2)

6.   In order to prove that, pursuant to section
523(a)(2)(A), a debt is nondischargeable as obtained through
fraud, the creditor must show (1) that the debtor made
representations other than a statement concerning his
financial condition, (2) that at the time the debtor made
the representations, he or she knew they were false, (3)
that the debtor made the representations with the intention
and purpose to deceive the creditor, (4) that the creditor
justifiably relied on such representations, and (5) that the
creditor sustained losses as a proximate result of the false
representations.  *In re Acosta*, 406 F.3d 367 (5th Cir.
2005); *RecoverEdge*, 44 F.3d. at 1293; *In re Rea*, 245 B.R. at

85; *Manheim Automotive Fin. Serv., Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 131 (Bankr. N.D. Tex. 2005).

7. False representations need not be overt. "When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation." *AT&T Universal Card Services v. Mercer (In re Mercer)*, 246 F.3d 391, 404 (5th Cir. 2001). Misrepresentations may also be made through conduct. *Id.*

8. However, "[d]ebts falling within the ambit of section 523(a)(2)(A) are those obtained by fraud 'involving moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made.'" *Provident Bank v. Merrick (In re Merrick)*, 347 B.R. 182, 186 (Bankr. M.D. La. 2006) (quoting *In re Martin*, 963 F.2d 809 (5th Cir. 1992)).

9. Intent to deceive may be inferred from "a reckless disregard for the truth or falsity of the statement." *In re Acosta*, 406 F.3d at 372.

10. "Intent of a kind sufficient to preclude discharge for debt for money obtained by debtor's false pretenses, false representation or actual fraud may be inferred where a debtor makes a false representation and knows or should know

that the statement will induce another to act." *In re Hurst*, 337 B.R. at 133.

11.   In evaluating a cause of action under section 523(a)(2)(A), whether it is a question of false pretenses or of false representation or of actual fraud, the court must determine that the plaintiff justifiably relied upon the representations made by the defendant. *Field v. Mans*, 516 U.S. 59, 61 (1995).

12.   Justifiable reliance does not require independent investigation of the facts as presented, but a plaintiff may not blindly rely upon a misrepresentation, the falsity of which would be obvious to the plaintiff had he used his sense to make a cursory examination. *Id*. at 69-71.

13.   Justifiable reliance is not a "reasonable man" standard, but is a lesser standard than reasonable reliance (which is a statutory element of section 523(a)(2)(B)). *Id*. at 76.

14.   The Debtor admitted in his Answer, and the evidence at trial was consistent, that he represented that he would use the Loan proceeds in connection with the Urban Woods project.  The Plaintiffs pledged the Property to secure the Loan based upon that representation.

15. The Plaintiffs' reliance on the representation that the proceeds of the Dallas National Bank Loan were to be used for Urban Woods was justifiable (and reasonable) given that there had been early discussion of Plaintiffs' making a general loan for Mr. Wood to "reorganize" all of his business projects, and the Plaintiffs made clear to Debtor that they were only interested in participating in the Urban Woods project.

16. The Plaintiffs would not have pledged the Property without the representation that the Dallas National Bank Loan proceeds would be used in connection with the Urban Woods project.

17. Accordingly, with regard to the $213,251.24 of the Loan proceeds which was not utilized in furtherance of the Urban Woods project, the Debtor obtained the use of the Plaintiff's Property by a false representation regarding how the Loan proceeds would be used. The portion of the Debtor's debt to Plaintiffs relating to that portion of the Loan proceeds not utilized in furtherance of the Urban Woods project is, therefore, nondischargeable pursuant to section 523(a)(2)(A).

18. With regard to the allegation that the Debtor falsely represented that the Loan proceeds would be

deposited in a separate account at Dallas National Bank, the court finds that the facts do not support a finding of nondischargeability under section 523(a)(2).

19.   The testimony of Mr. Michaux Nash, of Mr. Graham, and of Mr. Wood reflects that the bank would have liked for the Debtor to bank with Dallas National Bank, but there is no evidence—documentary or testimonial—that it was a requirement that the Debtor and/or PACC open an account at Dallas National Bank in order to obtain the Loan.

20.   In fact, on cross examination, Mr. Graham agreed that opening an account at Dallas National Bank "was not a requirement for closing the loan."   Transcript, page 142, lines 23-24.

21.   Even if Mr. Wood did make the false representation that he would open a separate account at Dallas National Bank into which the Loan proceeds would be deposited, there is not enough evidence to support the conclusion that the bank relied upon such false representation in extending the Loan or that the Plaintiffs relied upon that representation in pledging the Property.

22.   Accordingly, the Plaintiffs have failed to carry their burden under section 523(a)(2)(A) with regard to the allegation that the Debtor falsely represented he would

deposit the Loan proceeds into a separate account at Dallas National Bank.

23.  With regard to the allegation that the Debtor falsely represented that the Plaintiffs would be supplied with regular financial reports concerning the Urban Woods project, the court finds that the facts do not support a finding of nondischargeability under section 523(a)(2).

24.  First, there is no documentary evidence that the Debtor promised to provide such financial reports to the Plaintiffs.  Mr. Graham testified that it was his understanding that there were certain reports that were required to be made to the limited partners in the Urban Woods LP Agreement.

25.  Section 12.4 of the Urban Woods LP Agreement provides for certain quarterly reports to be made by the general partner, PACC 1996, to the limited partners.

26.  Neither Mr. Graham nor Mr. Tolson were limited partners of Urban Woods.

27.  Nothing presented—not Mr. Graham's testimony, not Mr. Tolson's testimony, not the Assignment of Net Profits Interest (Pls. Exh.  14)—reflects that Mr. Wood promised to or was otherwise required to present to the Plaintiffs the

same sort of reports as were required to be made to the limited partners.

28. Mr. Graham testified that he *expected* to receive the same sorts of reports as would be made to the limited partners in Urban Woods (this, despite his disavowal of having ever actually seen the Urban Woods LP Agreement prior to entering into the deal with Mr. Wood), but that he never received such reports. Mr. Graham's expectations, however, do not equal an affirmative representation by Mr. Wood or a requirement of Mr. Wood.

29. Mr. Wood more credibly testified that no such reports were promised and the court believes Mr. Wood. Mr. Wood emphatically denies that he made any promise that he would provide such-type reports to the Plaintiffs in connection with obtaining the Loan and asserted that Mr. Graham's counsel was "very thorough on what documents would be required." Transcript, page 284, lines 19-20.

30. Accordingly, the Plaintiffs have failed to carry their burden under section 523(a)(2)(A) with regard to the allegation that the Debtor falsely represented that the Plaintiffs would be supplied with regular financial reports concerning the Urban Woods project.

31. With regard to the allegation that the Debtor falsely represented that the Debtor had sufficient funds to complete the Urban Woods project, the Plaintiffs face two hurdles.

32. First, it was not the Debtor, individually, who was building the Urban Woods town homes, but a limited partnership operated by the Debtor. Accordingly, the Debtor's, Mr. Wood's, having sufficient funds to complete the Urban Woods project seems inapposite.

33. Second, to the extent that the Debtor, personally, having sufficient funds to complete the Urban Woods project was a fact upon which the Plaintiffs relied, it is a statement concerning the Debtor's financial condition that must be in writing pursuant to section 523(a)(2)(B).

34. No writing concerning Mr. Wood's financial condition upon which the Plaintiffs relied in agreeing to pledge their Property has been presented by the Plaintiffs. Mr. Graham testified that the only documents he reviewed prior to the pledge of his Property—and, therefore, the only documents upon which he (or Mr. Tolson—since Mr. Tolson depended upon Mr. Graham in that regard) could have possibly relied on in pledging the Property are as follows (see Transcript, pages 163-67):

-59-

a.  A facsimile from Mr. Wood to Mr. Graham containing information concerning the distribution of sales proceeds, unit calculations and construction costs of the Urban Woods Project (Pls. Exh.  1);

b.  A chart of PACC's existing projects as of August 16, 2000 (Pls. Exh. 2);

c.  A chart labeled "Pan American Capital Corp. Projected Organizational Chart" (Pls. Exh. 3);

d.  A memorandum dated October 10, 2000 from Mr. Graham to Mr. Wood outlining terms under which Mr. Graham would consider pledging the Property to secure an eventual loan (Pls. Exh. 4);

e.  A memorandum dated October 26, 2000 from Mr. Graham to Mr. Grindinger, Mr. Graham's attorney, explaining the sort of transaction Mr. Graham was considering entering into with Mr. Wood (Pls. Exh. 5);

f.  The same October 26, 2000 memorandum with Mr. Wood's counsel's hand marked changes (Pls. Exh. 6);

g.  The Loan Agreement (Pls. Exh. 10);

h.  The Deed of Trust (Pls. Exh. 11);

i.  The Promissory Note (Pls. Exh. 12);

j. A transmittal letter from counsel for Dallas National Bank containing the entire loan package (Pls. Exh. 13);

k. Assignment of Net Profits Interest (Pls. Exh. 14); and

l. An artist's rendering of what the Urban Woods project was supposed to look like, site plans, and photographs of the property that are not in evidence.

35. None of the documents listed in paragraph 34 above are statements concerning Mr. Wood's financial condition.

36. Accordingly, Plaintiffs have failed to carry their burden under section 523(a)(2)(B) to show that the Debtor falsely represented that the Debtor has sufficient funds to complete the project. [40]

37. With regard to the allegation that the Debtor failed to disclose to the Plaintiffs that the general contractor (PACC) on the Urban Woods project was a company controlled by the Debtor, the court finds that the facts do not support a finding of nondischargeability under section 523(a)(2).

---

[40] As more fully set forth below, the court also charges Mr. Graham with knowledge of the Urban Woods LP Agreement, Pls. Exh. 7, because such document was provided to his attorney, who is his agent, but that document, too, is not a document reflecting the Debtor's financial condition.

38. Mr. Wood testified that he provided a copy of the Urban Woods LP Agreement to Mr. Grindinger, counsel for Mr. Graham. And the Urban Woods LP Agreement makes clear the relationship between Mr. Wood and the general contractor, PACC. To wit, the definition of the term "General Contractor" on page five of the Urban Woods LP Agreement states that "[t]he General Partner [PACC 1996] hereby discloses to the Limited Partners that Lewis E. Wood owns not less than 51% of the membership interest of the General Contractor."

39. Mr. Graham denies having seen the Urban Woods LP Agreement, but he is charged with his agent's knowledge (his counsel) and Mr. Tolson, relying on Mr. Graham as agent, is also so charged.

40. Accordingly, the Plaintiffs have failed to carry their burden under section 523(a)(2)(A) with regard to the allegation that the Debtor failed to disclose to the Plaintiffs that the general contractor (PACC) on the Urban Woods project was a company controlled by the Debtor.

**11 U.S.C. § 523(a)(4)**

41. "A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt for

-62-

fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).

42. A claim of defalcation requires a fiduciary relationship between the debtor and the creditor. *In re Tomasek*, 175 Fed. Appx. 662, **5 (5th Cir. 2006).

43. "It is not enough that by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee *ex maleficio.* He must have been a trustee before the wrong and without reference thereto." *In re Gupta*, 394 F.3d 347, 350 (5th Cir. 2004) (*citing Davis v. Aetna Accept. Co.*, 293 U.S. 328 (1934)).

44. "[D]ebts arising from misappropriation by persons serving in a traditional, pre-existing fiduciary capacity, as understood by state law principles, are non-dischargeable." *Id.*

45. The concept of fiduciary under section 523(a)(4) is a much narrower one than under general common law and "is limited to instances involving express or technical trusts." *In re Miller*, 156 F.3d 598, 602 (5th Cir. 1998).

46. "Unlike debts arising out of fraud or defalcation, those arising out of embezzlement or larceny need not

-63-

involve a fiduciary." *In re Adams*, 348 B.R. 368, 373 (Bankr. E.D. La. 2005).

47.  The term larceny is interpreted under federal common law, and the court is not bound by the state law definitions of larceny. *In re Barrett*, 156 B.R. 529, 533 n. 3 (Bankr. N.D. Tex. 1993).

48.  Under federal common law, larceny is the "felonious taking of another's personal property with intent to convert it or deprive the owner of same." *Id*.  Larceny has also been defined as the "fraudulent and wrongful taking and carrying away of the property of another with intent to convert it to the taker's use and with intent to permanently deprive the owner of such property." *In re Hayden*, 248 B.R. 519, 526 (Bankr. N.D. Tex. 2000).

49.  Embezzlement is defined as "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *In re Miller*, 156 F.3d at 602.  In order to prove embezzlement, there must be proof that the creditor entrusted his property to the debtor, that the debtor appropriated the property for use other than that for which it was entrusted, and that there was intent to defraud on the part of the debtor. *Id*. at 603.  "One can wrongfully

appropriate [property] while acting under an erroneous belief of entitlement." *Id.*

50.  Mr. Wood is not a fiduciary of the Plaintiffs within the ambit of section 523(a)(4).

51.  However, at least with regard to those portions of the Loan proceeds that were expended for Mr. Wood's personal use,[41] the court finds that such amounts are also nondischargeable under section 523(a)(4) under the embezzlement prong of that section.  Mr. Wood was entrusted with the Loan proceeds for the purpose of utilizing such proceeds in furtherance of the Urban Woods project and he, instead, appropriated them and utilized them to pay his own personal debts and expenses.

52.  Even if the court were to accept Mr. Wood's explanation that the Loan proceeds were to be used for all of his businesses, generally, Mr. Wood could not have been under the erroneous belief that he was entitled to appropriate and use those proceeds to, e.g., buy shoes at Johnston & Murphy, pay for flying lessons, repay a personal loan, write birthday checks, or pay his personal taxes.

---

[41] That is, those amounts expended from the BOT Personal Account that were not (a) the $120,000 paid over to PACC and (b) the $6,731.82 that the court found were not shown to have not been utilized in furtherance of the Urban Woods project.

**Calculating the Damages**

53.  Because the Plaintiffs did not make a direct loan to the Debtor, the court cannot simply look at the raw dollars to determine how much of the debt owing to Plaintiffs is nondischargeable.

54.  The Plaintiffs pledged a piece of land, the Property, which the court determined had a value of $370,000 at the time of the Loan to the Debtor, to secure a Loan in the net amount of $242,381.09 from Dallas National Bank. The Debtor defaulted on the Loan and the Property was foreclosed upon.

55.  The Debtor's debt to the Plaintiffs is not simply the amount of the Loan proceeds not utilized in furtherance of Urban Woods, but that percentage of the Plaintiffs' loss represented by the percentage of the Loan proceeds not utilized in furtherance of the Urban Woods project.

56.  The damages to the Plaintiffs, therefore, are the value of the Property ($370,000) multiplied by the quotient of the nondischargeable amount of the Loan proceeds ($213,122.83) and the total amount of the Loan proceeds received by the debtor ($242,381.09).

57. Accordingly, the damages to the Plaintiffs and the Debtor's nondischargeable debt owing the Plaintiffs are: $325,336.63.

***END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW***